**ICE MILLER LLP**
Louis T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
Jessa DeGroote, Esq.
George A. Gasper, Esq. (admitted *pro hac vice*)
1500 Broadway, Suite 2900
New York, NY 10036
Phone: 212-835-6312
louis.delucia@icemiller.com
alyson.fiedler@icemiller.com

*Counsel to AIRN Liquidation Trust Co., LLC*
*in its capacity as Liquidation Trustee of the*
*AIRN Liquidation Trust*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC, [1]<br><br>Debtor. | Chapter 11<br><br>Case No. 22-14539 (JKS)<br><br>(Jointly Administered) |
| In re:<br><br>AIRN LIQUIDATION TRUST CO., LLC, in its capacity as Liquidation Trustee of the AIRN LIQUIDATION TRUST,<br><br>Plaintiff,<br><br>v.<br><br>VAN DUYNE, BRUNO & CO., P.A., and JACK GUTIERREZ,<br><br>Defendants. | Adv. Pro. No. _____ |

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/NRIA.

**COMPLAINT**

AIRN Liquidation Trust Co., LLC, in its capacity as Liquidation Trustee of the AIRN Liquidation Trust, individually and in its capacity as holder/assignee of the Contributed Claims of Contributing Investors (the "Liquidation Trustee" or "Plaintiff"), by and through its undersigned counsel, by way of its complaint against Van Duyne, Bruno, & Co., P.A. ("Van Duyne") and Jack Gutierrez ("Gutierrez") (together, "Defendants"), avers as follows:

**INTRODUCTION**

1.      The Liquidation Trustee seeks a judgment against Defendants for, among other wrongful acts, accounting malpractice, aiding and abetting fraud, and aiding and abetting securities fraud. Defendants substantially assisted the Ponzi scheme perpetrated by Thomas Nicholas (Nick) Salzano ("Salzano"), Rey Grabato II ("Grabato"), and others through National Realty Investment Advisors, LLC ("NRIA") and its related debtor entities (collectively, the "Debtors"). The scheme was perpetrated with Defendants' knowing assistance, prolonging the fraud through accounting practices which, among other things, artificially inflated the profitability of Debtors to entice Investors to invest unwittingly into the Ponzi scheme. With Defendants' knowledge, current and prospective investors and lenders relied upon NRIA's financial statements that were issued after Defendants performed various accounting services. The fraud eventually resulted in hundreds of millions of dollars of losses to the Debtors and the Debtors' investors.

2.      The Court should enter judgment against Van Duyne and Gutierrez and in favor of the Liquidation Trustee so that the Debtors' creditors and investors can recover at least part of their staggering damages.

3.      The Liquidation Trustee is continuing its investigation against Defendants and others and reserves the right to supplement this Complaint as additional facts and information become known.

## JURISDICTION

4.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C) and (O) and Federal Rule of Bankruptcy Procedure 7001 *et seq.*

5.      Venue of this action is proper in Bankruptcy Court for the District of New Jersey pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), this adversary proceeding relates to the above-captioned jointly administered Chapter 11 cases of the Debtors.

7.      Pursuant to Bankruptcy Rule 7008, Plaintiff consents to the entry of final orders or judgments by this Court, in the event it is determined that this Court cannot do so consistent with Article III of the United States Constitution absent the consent of the parties.

8.      This Court has personal jurisdiction over Defendants consistent with the Constitution and laws of the United States, as well as Bankruptcy Rule 7004(f) and other applicable law.

9.      The statutory and legal bases for the relief requested in this Complaint are section 105(a) of the Bankruptcy Code, Bankruptcy Rules 6009, 7001, and 7004, D.N.J. LBR 7003-1, and applicable state law, including New Jersey Statutes Annotated ("N.J.S.A.") sections 2A:53A-25 and 49:3-71.

## PARTIES

10.      AIRN Liquidation Trust Co., LLC is the Liquidation Trustee under the AIRN Liquidation Trust, a liquidating trust established under the *First Amended Joint Chapter 11 Plan of Liquidation of National Realty Investments Advisors, LLC, and its Affiliated Debtors* (Case No. 22-14539, Docket No. 3256) (as amended and supplemented, the "Plan") and the order confirming the same (Case No. 22-14539, Docket No. 3599).

11.     Pursuant to Article IV.F of the Plan, Plaintiff retains all rights to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all of the Debtors' or Estates' Causes of Action (whether existing as of the Petition Date or thereafter arising), and all Avoidance Actions and Contributed Claims, all well as Liquidation Trust Actions, as such terms is defined in the Plan.

12.     Defendant Van Duyne is a New Jersey domestic for-profit corporation with its principal place of business at 18 Hook Mountain Road, Pine Brook, New Jersey 07058.

13.     Defendant Gutierrez is, upon information and belief, a resident of New Jersey, and a principal of Defendant Van Duyne.

## **FACTS**

### I.    **NRIA Was A Massive Ponzi Scheme**

14.     Salzano, Grabato, Dustin Salzano, and other co-conspirators (the "Insiders") operated NRIA as a Ponzi scheme to defraud innocent investors (the "Investors") for the benefit of those in the Insiders' inner circle, themselves, and their affiliates to the detriment of the Debtors and the Investors. Through NRIA, the Insiders raised approximately $664 million from approximately 2,000 Investors. Hundreds of the Investors are innocent, duped retirees who lost millions in this scheme.

15.     Salzano was an independently contracted portfolio manager and adviser to NRIA.

16.     Grabato was President and 80% owner of NRIA although, as discussed below, Grabato did not act as much more than a figurehead for NRIA on behalf of Salzano.

17.     Coley O'Brien ("O'Brien") served as NRIA's Managing Director, Co-CIO of the Fund, and sole owner of NRIA Capital Partners which owned 20% of NRIA.

18.     Dustin Salzano is the son of Salzano and part-owner of U.S. Construction, Inc. ("USC"). John Farina is the other owner of USC.

19.    NRIA was held out by the Insiders to the investing public as a real estate investment, management, and development firm that since inception had developed dozens of luxury properties in Florida, New Jersey, New York, and Pennsylvania. The Insiders also claimed that NRIA would return extraordinarily above-market "guaranteed returns" to its Investors and that Investors would be paid their return of capital first. Specifically, the Insiders often caused NRIA to promise an annual return of at least 12% and to guarantee an annual distribution of 6% and, in many cases, much higher, during the first four years of an investment.

20.    In reality, the Insiders operated NRIA as a Ponzi scheme, using Investors' contributions to pay other Investors distributions and to pay the personal expenses of Salzano, Grabato, and their family members and inside circle. *See, e.g.*, Summary Cease and Desist Order (Case No. 22-14539, Docket No. 60); Administrative Consent Order between the New Jersey Bureau of Securities, NRIA, the Fund, and NRIA Structured Credit Strategies, LLC (Docket No. 1651); Complaint filed in *Securities and Exchange Commission v. National Realty Investment Advisors LLC, et al.* (D.N.J. Case No. 22-06066, Docket No. 1); Indictment filed in *United States of America v. Salzano and Grabato* (D.N.J. Case No. 22-00690, Docket No. 19); Plea Agreement filed in *United States of America v. Salzano and Grabato* (D.N.J. Case No. 22-00690, Docket No. 86); *AIRN Liquidation Trust Co., LLC, v. Media Effective LLC et al.*, Adv. Pro. No. 23-01335, Docket No. 19, at *7 (October 11, 2024) (applying the Ponzi scheme presumption).

**Early Stages of the Fraud**

21.    In or around 2007, Salzano and Grabato began locating properties that could be marketed and sold to Investors. Soon after, they joined forces with USC which worked on nearly all of NRIA's projects and regularly managed Investor accounts and made Investor distributions for NIRA. The connection of USC to NRIA and USC's ownership was concealed from Investors

by the Insiders. Meanwhile, internally, the two entities were so closely connected that at least some members of NRIA's management believed USC was a subsidiary of NRIA.

22.    Initially, the pitch to potential investors was that if the investor purchased the property and took out a loan to renovate or redevelop the property, NRIA would guarantee that the investor would sell or rent the property for a profit. To enhance the attractiveness of this investment opportunity, the Insiders pitched USC as an "independent" business partner that would perform the construction work under a fast-build guarantee. USC's fast-build guarantee promised the investor that if the renovations for the investor's property were not completed within a set timeframe, USC would pay a per diem penalty to the investor.

23.    In addition to the fast-build guarantees, for properties redeveloped to be leased, the Insiders gave Investors a rental guarantee provided by another seemingly independent company, Premier Access Property Management ("Premier"). In fact, Premier had the same ownership as USC and was not in any way independent from the NRIA Insiders.

24.    The Insiders knew that the bogus fast build and rental guarantees were attractive to Investors because the guarantees gave the appearance that NRIA's two "independent" business partners were willing to share the risk with the Investors by offering guarantees on the property development projects.

25.    Appearances aside, neither USC nor Premier shared risk with the Investors because neither entity ever intended to pay out on the offered guarantees. In the event it ever became necessary to pay out on a guarantee, it was agreed to by and among the Insiders and the principals of USC and Premier that NRIA would covertly backstop these payouts by using other investor funds.

26.     In addition to the fast-build and rent guarantees, the Insiders caused NRIA to give Investors "Customer Satisfaction Buy Back Guarantees" that guaranteed that the property would ultimately sell for a minimum price or NRIA would pay the difference. This, together with the fast-build and rent guarantees, was how the Insiders first created the illusion that NRIA was offering a no-risk investment opportunity.

27.     To keep the fraud scheme viable, the Insiders caused NRIA to pay at least $899,549 to fulfill USC's obligations under the fast build guarantees, at least $4,100,086 to fulfill Premier's obligations under the rent guarantees, and approximately $5,000,000 to fulfill obligations on the buy-back guarantees.

28.     As discussed above, the Insiders misrepresented and concealed the interdependence between and among NRIA, USC, and Premier (and the funds with which they operated) to mislead investors into believing their investments were ostensibly "risk free" because of the multiple guarantees from multiple entities that were sharing the risk of these property developments. But the reality was that the Insiders operated these companies in unison and would only pay out on these guarantees to deter Investor suspicion and to keep the fraud alive.

29.     To further facilitate the fraud, beginning in 2016, the Insiders, through NRIA, offered Investors interests in a series of limited liability companies ("LLCs") as investments in developing real estate properties. These opportunities were marketed to Investors as securities exempt from registration under applicable securities laws. Each LLC purportedly held a single investment property, and the Insiders represented to each Investor which specific property the Investors were investing in and from which properties they would allegedly receive distributions. Investors were promised that each LLC would use its own money to pay for its expenses and would not be commingled with other companies or projects.

30.      Contrary to the representations to Investors by the Insiders, funds were routinely commingled among other LLCs and NRIA itself, such that investor A's dollars were used to pay the "guaranteed" returns of investor B to a separate LLC. All of this was done without the Investors' knowledge. The Insiders also continued the practice of fast build guarantees, rental guarantees, and buy-back guarantees. The Insiders also guaranteed a minimum annual return and projected a much higher targeted return, as well as immediate monthly distributions, for many of the LLCs.

**The Fund**

31.      On February 5, 2018, Salzano, Grabato, and Arthur S. Scuttaro (also known as Arthur Scutaro) ("Scuttaro"), with the assistance, participation, and in collaboration with others, formed NRIA Partners Portfolio Fund I LLC (the "Fund"). The Insiders had two primary goals for the Fund: (1) to increase the scale of the Ponzi scheme so that the Insiders could continue to defraud investors and (2) to conceal from Investors that the LLCs were not profitable, and to "roll-up" Investor losses without ever disclosing the "roll-ups" to the other existing Fund Investors. The losses at the LLCs were concealed by encouraging Investors to "roll-up" their investment in the LLCs into the Fund. Additionally, the Fund eliminated the obligation for the Insiders to buy back property under the "Guaranteed Buy Back" program, and the creation of the Fund made it more difficult for Investors to track the progress on any particular property in which they were invested or the alleged profits flowing therefrom.

32.      Under a roll-up into the Fund, Investors would exchange their membership interest in the LLC for a membership interest in the Fund, rather than demand an immediate cash payout. Each roll up into the Fund was effectively a sale out of one security, the LLC, and a purchase of another security, the Fund. The Insiders needed Investors to roll into the Fund because there was

not enough cash to pay all Investors their initial principal investments, let alone their promised (and falsely reported) "returns." NRIA ceased making promised distributions to Investors in certain of the LLCs, and those and other LLC Investors were promised an immediate monthly distribution of 6% or more to roll over into the Fund.

33.     To induce Investors to roll-up their LLC investments, the Insiders offered Investors a "bonus" interest in the Fund in exchange for no additional payment or consideration. For example, if an investor had invested $100,000 in an LLC and "earned" a guaranteed return of $12,000, she might be offered an interest in the Fund of $120,000, comprised of her original principal investment of $100,000 plus the $12,000 return, plus an $8,000 bonus interest. The investor was also promised immediate distributions on the new amount ($120,000 in this example) of at least six percent or more on the adjusted new rolled over amount.

34.     Accordingly, an investor who agreed to roll-up her investment into the Fund would receive a principal investment in the Fund equal to the investor's original cash investment plus a phantom equity interest equal to (a) the "profits" the investor had purportedly earned on her LLC investment; (b) the arbitrary roll-up bonus; and c) distributions calculated on the new artificially inflated amount. These bonuses were not offered to Investors who were not rolling up LLC investments into the Fund and were not disclosed to other Investors and prospective Fund Investors despite the fact that the bonuses being offered diluted the investments of the existing and prospective Fund investors whose interests were not "rolled up."

35.     The Insiders rolled up nearly $49.5 million in LLC principal, giving such Investors interests into the Fund in the aggregate amount of at least $75.1 million. The substantial phantom profits, bonuses, and consequential distributions of the LLC Investors who rolled into the Fund

were not disclosed to Investors and damaged the other Fund Investors by diluting their interests without a commensurate investor or cash infusion by the "rolled-up" investor.

## The Insiders' Operation of the Fraud

36.     NRIA was purportedly operated by Grabato as President. In reality, Grabato generally participated in management as a signatory – his name and signature stamp were used extensively by Salzano and the other Insiders (such as Dustin Salzano) who operated NRIA. They used Grabato as a front to attempt to conceal Salzano's history of fraud and involvement in the operation and control of NRIA.

37.     Neither Salzano's role in NRIA's operations nor his prior significant criminal record and past as an adjudicated fraudster was ever disclosed to Investors. In fact, Salzano, Grabato, Scuttaro and other Insiders took active steps (with material assistance of others) to purposefully conceal Salzano's history of fraud and criminal past.

38.     In 2013, Salzano pleaded guilty for his role in the NorVergence fraud which resulted in a $50 million consent judgment against Salzano and in favor of the FTC. [2] The Insiders knew that Salzano's criminal past would materially impair their ability to solicit investors in their fraud scheme. As a result, the Insiders caused NRIA to expend millions of dollars of investor funds on third party vendors to "scrub" the internet to conceal Salzano's criminal past. The Insiders also referred to Salzano by his middle name, Nicholas, rather than his first name, Thomas. Similarly, Scuttaro was involved in the NorVergence fraud and changed the spelling of his last name while working with NRIA to conceal his fraudulent history. The Insiders listed "Scuttaro" as "Art

---

[2] *See* U.S. Dept. of Justice, *Two Leaders of Real Estate Investment Firm Indicted in $650 million Ponzi Scheme Conspiracy*, *available at* https://www.justice.gov/usao-nj/pr/two-leaders-real-estate-investment-firm-indicted-650-million-ponzi-scheme-conspiracy (Oct. 13, 2022) ("Salzano concealed his true managerial role at NRIA while using Grabato as a stand-in CEO in an effort to avoid scrutiny by investors of Salzano's prior guilty plea to defrauding small businesses in Louisiana through a large telecommunications company."); *see also* Federal Trade Commission, *FTC Settles Court Case Against NorVergence Principals*, *available at* https://www.ftc.gov/news-events/news/press-releases/2006/06/ftc-settles-court-case-against-norvergence-principals (June 26, 2006).

Scutaro" when identifying his role as "Vice President and Advisor" for NRIA and did not use the actual spelling of his name nor mention that he was likewise involved in the NorVergence fraud.

39.     The Insiders were removed or resigned from control of NRIA before the Debtors filed chapter 11 petitions in the United States Bankruptcy Court for the District of New Jersey on June 7, 2022.

40.     On March 4, 2021, Salzano was arrested at NRIA's main office in connection with an attempted fraud on a bank and investor while "employed" at NRIA. Salzano acted as the *de facto* president or chief executive officer of NRIA until he was removed in October 2021—seven months after he was arrested in connection with part of this overarching scheme.

41.     On November 1, 2021, Brian Casey of the Casey Group, Ltd. was appointed to assume certain management functions for the Debtors, removing the Insiders from control of NRIA and operating as an independent manager of NRIA. *See* Declaration in Support of Chapter 11 Petitions and First Day Pleadings (Case No. 22-14539, Docket No. 16). Also, before the bankruptcy filing, Grabato stepped away from the nominal title of Manager, President, and Chief Executive Officer of NRIA and fled the country.

**The Insiders' Misuse of Investor and Debtor Funds**

42.     In addition to concealing Salzano's criminal history and operation of NRIA, the Insiders also failed to disclose many conflicts of interest and misused Investor funds to personally benefit the Insiders and their families and friends – to the detriment of the Debtors and Investors. Many of the employees and contractors of NRIA were family members or friends of Salzano, Grabato, and other Insiders, who were "overpaid" for purported services and, in some instances, services that may not have been rendered at all.

43.     In addition to the payments to USC, the Insiders caused NRIA to pay hundreds of thousands of dollars to Salzano's son-in-law's company (the same son-in-law who was Vice President of Information Technology at NRIA). Other Salzano relatives were paid for business entity formation fees, purchasing and leasing equipment, real estate commissions, and other services which in part include services they did not perform or were not qualified to perform. Salzano's daughter, Bethany Salzano, and the entity she created and controlled also received millions of dollars in diverted Investor funds. These funds were also used to pay Salzano's alimony payment obligations to his former spouse. Other Insiders' friends and families also received diverted Investor funds.

44.     NRIA charged the Fund annual development fees of up to 4.5% of the overall value of any given project, and the development fees were recorded and paid at the outset of the projects using commingled Investor funds, not when performance obligations were met as required by standard business practices and Generally Accepted Accounting Principles ("GAAP"). *See* Accounting Standards Codification ("ASC") 606, *et seq*. This practice, blessed by Defendants, grossly inflated NRIA's revenue and profitability on its financial statements, with any references to GAAP departures intentionally buried by Defendants in a footnote as described *infra*. These financial statements, which were distributed to and relied upon by prospective and current investors and lenders, would have shown steep year-over-year losses if not for the improper recognition of the development fees – something Nick Salzano collaborated with Defendants to hide in order to keep the fraudulent scheme afloat.

45.     The Insiders also used "straw" purchasers to complete transactions with the intent of giving a false appearance of a high demand for NRIA's properties when the demand for these properties was in fact much lower. These "straw" purchasers were individuals employed by or

close to NRIA or entities owned by individuals close to Insiders, who purchased the properties

using funds from Debtor bank accounts commingled with Investor funds. This scheme and the

resulting inflated demand were not disclosed to Investors and were also deployed by the Insiders

to fraudulently induce lenders to lend to NRIA, including with respect to at least one property for

which Defendants were retained to compile financial statements—1901 Wright By the Sea, LLC

(also known as Ocean Delray).

46.    In September 2020, the Insiders began using Investor funds to purchase risky

Commercial Mortgage-Backed Securities ("CMBS"). This practice involved tens of millions of

dollars of Investor funds, which increased risk to Investors. The Insiders did not clearly disclose

that Investor funds were being used to purchase CMBSs or the risks associated therewith. Instead,

the Insiders simply mentioned in the Private Placement Memoranda ("PPMs") until June 2021 that

NRIA *might* use Investor funds for these types of investments.

47.    The Insiders continuously misrepresented to Investors that their money was being

used to further the Fund's actual purpose: developing real estate. In reality, the Insiders were

causing NRIA to misuse Investor money in a variety of ways including those described throughout

this complaint—a fact known by Defendants.

48.    Throughout the Insiders' operation of NRIA, the Insiders represented to Investors

that its business strategy—and the reason it allegedly was so profitable—was purchasing

properties at below-market value which were then developed and/or renovated into profitable sale

properties. Consent Order at 9. In reality, the Insiders were using NRIA to purchase properties

identified by intermediaries (*i.e.*, wholesalers such as Phillip McFillin, an individual who

previously pled guilty to real estate related racketeering) who found properties for purchase but at

a substantial cost to NRIA and Investors. Defendants were aware of the substantial fees being paid to these intermediaries.

49.    Because NRIA did not generate enough revenue from operations to cover distributions and the high, guaranteed returns promised to Investors, the Insiders falsified Debtors' financial statements and financial information included within marketing materials to mislead Investors. As detailed below, Defendants assisted in reviewing and blessing misleading financial statements and other documents to help the Insiders perpetrate and further the fraud.

50.    NRIA had little to no profits, a fact Defendants knew from their access to NRIA's financial information and financial statements it reviewed. To keep the Ponzi scheme afloat, the Insiders needed to continually receive substantial new Investor funds. To do so, the Insiders caused NRIA to engage in a massive, expensive advertising initiative on nationwide radio and television and through multiple billboards in New Jersey and elsewhere. For example, billboards in high traffic areas in New Jersey lured Investors into the scheme by promising unrealistic 12% "guaranteed" returns and targeted returns up to 21%.

51.    The Insider's widely publicized claims of offering such extraordinary, guaranteed returns in a low interest rate environment were inescapable red flags of fraud, and in particular, to accounting and financial professionals like Defendants.

52.    The Insiders caused NRIA to spend over $84 million on advertising and promotional costs, which amounts to more than 13% of the monies received from Investors. Gutierrez raised the issue of the high advertising cost per Investor with the Insiders citing potential credibility issues for both Van Duyne and NRIA. Defendants proceeded, however, to accept the Insiders recording the high advertising costs in a way that misled Investors into believing NRIA was more profitable than it actually was.

53.     The Insiders also repeatedly misrepresented in PPMs that distributions would come from the operating cash flow derived from investments made by the underlying operating companies. In actuality, distributions were paid not by profit generated from operations but by new and existing Investor funds that had been invested in the Fund and commingled among Debtor accounts.

54.     As stated throughout this Complaint, the Insiders prepared and assisted in the preparation of documents and communications provided to Investors in connection with the offer, sale, or purchase of securities that contained untrue statements of material facts, including but not limited to:

    a.  The offering documents, consisting of PPMs and attachments, for the first approximately 12 LLC offerings claimed that Investors' funds would be deposited into an escrow account with a law firm. Subsequent pre-Fund offerings falsely claimed that Investors' funds would be deposited into an account that did not exist, the National Realty Investment Advisors, LLC – Property Holding Account. Instead, those Investor funds were deposited in an NRIA operating account and commingled with funds from all other sources despite the LLCs' operating agreements requiring that each company segregate their funds in bank accounts in their own names and prohibiting the companies from commingling those funds with the funds of any other person.

    b.  The LLC PPMs falsely stated that NRIA would fund any shortfall in members' capital accounts to realize the minimum guaranteed annualized return of about 10% or higher and pay off any loans when, in reality, NRIA could not carry out such

payments without commingling investor funds such that new investors were used
to pay old investors;

c.  The LLC PPMs falsely stated NRIA would purchase the developed property from
the LLC's manager entity if necessary to ensure the guaranteed returns to investors
were achieved within the timeframe provided when, in reality, NRIA could not
carry out such payments without commingling investor funds such that new
investors were used to pay old investors;

d.  The LLC PPMs each included a "Fixed-Price New Construction Agreement"
signed by USC that agreed to a fixed amount for each of the properties when, in
reality, USC was in control of and distributed monies from the LLC bank accounts
to itself in excess of and on schedules that differed from those set out in the PPM
exhibits;

e.  Investments in approximately 13 of the LLCs were offered through PPMs
representing that the LLC was obligated to pay guaranteed monthly distributions
ranging from an annualized 7.5% to 12% with certain of the entities offering
stepped up distributions as high as an annualized 14% for larger investments, but
the PPMs never disclosed that these payments would be made from the funds
provided by other investors and lenders including those misapplied from Investors
in other LLCs and the commingled funds of Investors in the Fund and that USC
would be responsible for the maintenance and distribution of monies from such
accounts (including possession of investors' ACH, social security, and subscription
information);

f.  Several of the LLC PPMs also represented that investor returns would be reserved in advance and segregated into a separate bank account with the LLC's licensed property manager, Premier. However, the funds supposedly earmarked for distribution to investors were never segregated nor earmarked nor held in a separate bank account by Premier or any other entity. Instead, the Insiders paid distributions from bank accounts holding the Investors' own money, funds from lenders, or commingled funds of other Investors, and when those bank accounts could not cover the distributions, NRIA provided the Insiders the necessary funds to make the distributions;

g.  The LLC PPMs falsely described Salzano as having a diversified 30-year background in real estate development and omitted his history of fraud. The other Insiders, all of which had extensive dealings with Salzano, knew that Salzano did not have extensive experience in real estate development dating back three decades and knew that the description failed to disclose his prior criminal history;

h.  The Fund PPMs falsely stated that "returns to investors will at least amount to a minimum guaranteed 12% annualized return or else any shortfall will be paid by [NRIA]" and further explained that 100% of all cash flows would be dedicated to lenders and investors first and that NRIA would only be paid after investors received their preferred returns and return of capital. The language of the guarantee was "absolute and without conditions." These statements were false, and the Insiders knew that these statements were false and that NRIA would be paid before investors;

i.   The Fund PPMs also did not disclose that many of the LLC bank accounts and some of the major property level LLC Fund bank accounts were actually under the control of USC and its employees, and that USC used Grabato's signature stamp on payments, including payments to itself;

j.   The Fund PPMs materially omit Salzano's involvement in the NorVergence fraud, NorVergence's bankruptcy, and Salzano's criminal charges arising therefrom, facts known to the Insiders;

k.   The Fund PPMs failed to disclose NRIA's historically poor track-record of failing to meet its obligations to timely complete the LLC projects and the consequential adverse impact on the Fund and its Investors resulting from the incentives promised to induce Investors in those projects to rollover into the Fund; and

l.   The Fund PPMs falsely represented that NRIA did not pay any referral fees or commissions to anyone soliciting new investments when in fact NRIA paid millions of dollars of investor money to third parties as commissions and for investor referrals.

55.   Absent a continuous stream of new Investor money, NRIA could not pay its obligations to existing Investors and was clearly unable to absorb the losses it incurred from the properties it held. This inability to fund NRIA's obligations to Investors without new Investor money began even prior to the establishment of the Fund, which simply served as a further principal vehicle to conceal NRIA's actual "pre-Fund" property level losses, thereby diluting and damaging other Fund Investors. Without Defendants role as the Debtors' accountants, the Insiders would not have been able to continue concealing the scheme and keep the fraud afloat.

## II.    Van Duyne and Jack Gutierrez's Role in the Ponzi Scheme

### The Engagement of Defendants

56.    According to Van Duyne's public website, Van Duyne specializes in full-service accounting and business management. In particular, the website notes that "when sifting among accounting firms specializing in the construction industry, Van Duyne is [New Jersey's] most experienced and qualified." **Ex. A**, Website. **Exhibit A** is a screen grab of the Van Duyne website, https://www.vb-cpa.com/industries/construction, as of December 4, 2024.

57.    Defendants provided a variety of accounting services to NRIA and related entities between approximately September 2018 to the end of 2020. **Ex. B**, Engagement Letters. **Exhibit B** includes engagement letters produced in Rule 3004 discovery thus far.

58.    These services including reviews, compilations, preparation of tax returns and K-1s, Real Estate Owned ("REO") schedules, and other *ad hoc* requests. Defendants also performed an audit for NRIA Guttenberg Capital 6269 Manager LLC in 2019. The audit was required in order to register with the New Jersey Department of Community Affairs. **Ex. C**, DCA Letter; *see also* **Ex. D**, Guttenberg Audit Email.

59.    Defendants' compilation of REO schedules provided a purported total net equity of all of NRIA's real estate projects. **Ex. E**, REO YE2019.

60.    Salzano and other Debtor employees primarily worked with Gutierrez, a CPA and Principal at Van Duyne. Stefano D'Urso ("D'Urso"), a CPA and Tax Director, also assisted.

61.    NRIA and Van Duyne entered into multiple engagement letters, including an engagement letter signed on June 10, 2020, that covered review services for the 2019 NRIA LLC consolidated year-end financial statements (the "2019 Letter"). **Ex. F**, 2019 EL.

62.     Notably, the 2019 Letter required NRIA to indemnify Van Duyne against potential liability, stating: "You agree to hold us harmless and to release, indemnify and defend us from any liability or costs, including attorney's fees resulting from management's knowing misrepresentations to us." *Id.*

63.     This indemnification language, which did not exist in prior year engagement letters, indicates that Defendants expected NRIA's management to make misrepresentations that may lead to liability for Van Duyne. This is consistent with communications from Gutierrez in which he raised significant concerns about NRIA's accounting and business practices but then continued to perform work and accounting services for the company but did not correct NRIA's prior misdeeds.

64.     NRIA and Van Duyne also executed a Master Engagement Letter for the NRIA LLCs[3] in January 2020. *Id.* The January 2020 Master Letter noted that Van Duyne had been engaged to "prepare the financial statements" and "perform a compilation engagement with respect to those financial statements." *Id.*

65.     As a result of Van Duyne's intimate relationship with the Insiders and NRIA, both Van Duyne and Gutierrez personally were aware of how the Insiders operated NRIA, including recognition that despite Grabato's title, Salzano was actually making the decisions – which was never disclosed to Investors who were misled as to Salzano's true role. ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[3] The NRIA LLCs are the Debtor entity LLCs formed to hold the individual properties purchased by NRIA for redevelopment, each of which had a separate bank account and was to receive investor monies and pay investor returns separately.

██████████ **Ex. G**, 2019 EL Email. Gutierrez clearly knew that Salzano was the primary

decision maker at NRIA, a fact concealed from Investors.

66.     Further, Defendants had access to NRIA's financial documents including but not

limited to general ledgers, balance sheets, and bank statements, and, therefore, knew the entire

financial picture of NRIA. *See, e.g.*, **Ex. H**, 2019.05.09 - 2018 Financials and **Ex. I**, 2019.05.02 -

Open Items.

### Van Duyne and Gutierrez Knowingly Allowed the Insiders to Use Improper Accounting Methods that Departed from GAAP

67.     Defendants provided a variety of accounting services to Debtors between 2018 and

2020, including year-end reviews for the NRIA LLC and subsidiary entities' consolidated financial

statements in 2018 and 2019.

68.     During that time frame, Defendants' accounting services departed from GAAP and

knowingly allowed the Insiders to conceal significant year-over-year losses. American Institute of

Certified Public Accountant ("AICPA") guidance for financial statement reviews specifically

instructs accountants to be alert for unusual transactions and accounting practices and complex

revenue recognition methods – transactions and practices that Defendants repeatedly ignored:

a.   "In obtaining the understanding of the entity's accounting policies and practices,

the accountant should be alert to accounting policies and procedures that, based on

the accountant's knowledge of the industry, are unusual." (AR-C Sect. 90, Para.

.23).

b.   "The accountant should inquire of members of management who have

responsibility for financial and accounting matters concerning the financial

statements, and others within the entity, as appropriate, about…whether there are

significant, unusual, or complex transactions, events, or matters that have affected

or may affect the entity's financial statements" (AR-C Section 90, Para. .29)

c. "Maintaining professional skepticism throughout the review is necessary if the

accountant is, for example, to reduce the risks of overlooking unusual

circumstances…" (AR-C Sect. 90, Para. .A18).

d. "Additional examples of unusual or complex transactions, events, or matters about

which the accountant may inquire of management are as follows:

i. New or complex revenue recognition methods

ii. Significant, unusual, infrequently occurring transactions

iii. Application of new accounting principles

iv. Changes in accounting principles or the methods of applying them

v. Trends and developments affecting accounting estimates, such

as…realization of unearned income" (AR-C Sect. 90, Para. .A57).

69. Not only were GAAP departures related to development fee revenue in NRIA's

financial statements disclosed inadequately, numerous other improper, non-GAAP accounting

methods were ignored by Defendants. This decision by Defendants resulted in financial statements

that did not reasonably portray NRIA's true financial position and misled Investors and lenders.

70. In Defendants' 2018 Review Report and related NRIA financial statements, $11.13

million of development fees receivable were included in NRIA's total assets and related revenue.

**Ex. J**, 2018 Con. Fin. Statements. This number was purportedly based on the *future* resale and

performance milestones of *incomplete* Debtor properties. The inclusion of this upfront revenue

allowed for a positive net income amount of $1,912,412 on NRIA's financial statements. *Id.* As

Defendants were aware, without the inclusion of these upfront development fees as revenue for

2018, NRIA's income statement would have had a *loss* of roughly $9.2 million as opposed to a net

profit of approximately $1.9 million. Under GAAP and ASC 606, revenue is not recognized

upfront but over time as performance obligations are satisfied.

71.    Defendants were aware that the way the development fees were being included in

NRIA's financials was a departure from GAAP and stated so in Note 1 of the "Notes to

Consolidated Financial Statements" for 2018. *Id.*

<u>Development Fees Receivable and Revenue Recognition</u>

The Company records development fees receivable at the time an agreement is signed with the respective subsidiary (property). Such fees are to be paid by the end purchaser of the land and/or building at project completion. The recognition of both the development fee receivable and applicable revenue does not meet the stricter recent criteria of the new revenue recognition rules per FASB ASC 606, effective in 2018, and therefore is not in accordance with U.S. GAAP. Such new rule criteria primarily requires that revenue is recognized when several performance obligations are satisfied by the entity which is when control of the underlying good or service is transferred to the buyer. There are $11,130,000 of development fees receivable and related revenue on the consolidated balance sheet and statement of income and members' equity, respectively, which fees are built into the resale value of each property developed. It is management's opinion that these receivables are collectible beyond a reasonable doubt upon the sale of each respective property due to management's reasonable estimates of the property sales revenues anticipated at completion. It is management's view that its method is in keeping in line with properties under construction and their anticipated future value.

*Id.* at p. 6.

72.    Defendants knew or should have known that the text of the note was insufficient to

avoid misleading Investors and lenders as to NRIA's true financial state. As stated in AICPA

guidance for financial statement reviews, "In forming the conclusion on the financial statements,

the accountant should do the following…Consider whether…the **financial statements provide**

**adequate disclosures to enable the intended users to understand the effects of material**

**transactions and events on the information conveyed in the financial statements.**" (AR-C

Sect. 90, Para .64) (emphasis added).

73.    Defendants knew or should have known that the primary intended users of the financial statements were current or prospective individual investors (most of whom were likely not familiar with GAAP and other technical accounting guidance), and the note was not adequate for them to fully understand the material impact–concealing year-over-year losses–of including this upfront revenue. Salzano also explicitly told Defendants that the purpose of including this non-GAAP revenue was to show a profit rather than steep losses that may impact the scheme's ability to retain and attract new investors.



**Ex. K**, 2020.11.11 – Con. Report Email (emphasis added).

74.    Similarly, Defendants were aware of and noted in the Review Report of 2019 financials that NRIA had included $10 million of development fees receivable and related revenue on NRIA's December 31, 2019, Balance Sheet. **Ex. L**, 2019 Con. Fin. Statements. Defendants' Review Report itself stated: "If accounting principles generally accepted in the [USA] had been strictly followed, (i) Asset Management, Development and Project Management fees receivable, and (ii) revenue and members' equity would have been decreased by (i) $10,000,000 and (ii) $19,000,000, respectively." *Id.*

75. Also buried within the note, the report states: "The recognition of these fees receivable and applicable revenue does not currently meet the criteria of revenue recognition rules per FASB ASC 606, effective in 2018, and therefore is not in accordance with U.S. GAAP." *Id.* No illustrative calculation is included in the report to disclose to Investors and lenders the more than $9 million loss the report would have shown if not for the non-GAAP recognition of the upfront development fees.

76. Again, Defendants knew or should have known that this note was inadequate to correct the misimpression the overall financial statement reviewed by Defendants created in the minds of Investors, who Defendants knew were the primary users of the financial statements, regarding the financial health of NRIA.

77. Similarly, Van Duyne performed a 2019 compilation report for NRIA entity N. Ocean Capital 2929 B, LLC which illustrates that Van Duyne was aware of the Insiders' fraud and the dire consequences its accounting practices would have for Investors.



**Ex. M**, 2929 Compilation Report.

78. Defendants also knew that the financial statements Defendants reviewed and the representations made in the reports by the Insiders regarding this unusual accounting method were inaccurate and created significant credibility issues.

79.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████ **Ex. N**, GAAP Reporting Issues (emphasis added).



*Id.*

80.    ████████████████████████████

**Ex. O**, GAAP Reporting Issues Replies (emphasis in original).

81. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████



*Id.* (emphasis added).

82. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ *Id.*

83. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

84.     Van Duyne and Gutierrez consistently accepted knowingly untrue and misleading explanations from Salzano related to NRIA's accounting practices rather than intervening and advising the appropriate adjustments to be made to the financial statements, updating the review report to reflect the material misstatements, or withdrawing from the engagement. Outside accounting and financial advisers are hired to intervene and advise and prospective and current investors expected Defendants to do so when relying upon financial statements reviewed by Defendants.

85.     Defendants failed to perform reviews that met the standards established under AICPA guidance and seemingly chose generating fees and pleasing the Insiders over the needs of the Investors. In opposition to AICPA guidance for financial statement reviews, Defendants repeatedly failed to maintain professional skepticism when assessing clear information that brought into question the reliability of the Insiders' responses to Defendants' inquiries. They also failed to consider the sufficiency and appropriateness of review evidence obtained in light of management's inaccurate and unreliable responses.[4] The accounting guidance further states "[a] belief that management and those charged with governance are honest and have integrity does not relieve the accountant of the need to maintain professional skepticism or allow the accountant to be satisfied with less than persuasive review evidence when obtaining limited assurance." (AR-C Sect. 90, Para. .A21).

86.     Between 2018 and 2020, Defendants allowed more than $40 million in upfront development, asset management, and project management fees to be recognized by on NRIA financial statements. Without upfront recognition of these fees, the Debtors' financial statements would have shown steep year-over-year losses.

### Defendants' Knowing Involvement in Concealing the Insiders' Massive Advertising Spend and Related Financial Statement Expenses

87.     Defendants were also aware of, condoned, and implemented the Insider's capitalization of more than $13 million in advertising and marketing expenses. This practice allowed for these expenses to be spread out over a 10-year period rather than fully expensed in the year they were incurred – something that would have led to even more significant losses in NRIA's

---

[4] AR-C Section 90, Paragraph .A19 states, "Professional skepticism is necessary to the critical assessment of review evidence. This includes questioning contradictory review evidence and the reliability of responses to inquiries and other information obtained from management and those charged with governance. It also includes consideration of the sufficiency and appropriateness of review evidence obtained in light of the circumstances."

2019 financial statements. This accounting practice again departed from GAAP, but no non-GAAP

disclosure was noted in Defendants' reports nor NRIA's financial statements which enabled

Defendants and the Insiders to conceal the massive advertising spend. Specifically, this treatment

was not compliant with ASC 340-40 effective December 2019 and likely was not compliant under

authoritative GAAP accounting guidance prior to December 2019.

88. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████ **Ex. P**, 2020.05.29 – Capitalizing Costs. ████████████

████████████████████████████████████████████████

██████████████████████████████

89. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

90. ██████████████████████████████████

████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

*Id.* (emphasis in original).

91. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████



*Id.* (emphasis added).

92. 

*Id.* (emphasis added).

93.     A few days later, on June 6, 2020, Salzano emailed Gutierrez and D'Urso, and discussed advertising and marketing expenses, specifically the decision by the Insiders to amortize the expenses over *10 years*. **Ex. Q**, 2020.06.06 – Investor Advertising ("Since the vast majority of investors [85% or more] Are projected to stay with us for a much longer time period on average – a period we project at 10 years or more – we're going to use a 10-year amortization of the advertising expenses for the books."). In a matter of days, Salzano expanded the time period to amortize the advertising expenses from 5 years to 10 years–a red flag indicative of fraud ignored by Defendants. The capitalization of the advertising expenses was improper, especially amortizing the expenses over such a long, unsubstantiated period of 10 years.

94.     In the same email chain, Salzano said NRIA investigated their 2019 advertising and promotion marketing expenses specifically for investor recruitment, and $10,907,960 of these expenses were "exclusively segregated into one account number: 65115-0 [Advertising, Promo, & P.R. Expense]." *Id.* Notably, a review of the transaction detail for account number 65115-0 reveals numerous expenses that do not relate to Investor recruitment including but not limited to:

    a.  $300,000 in total payments to Olena Budinska – Nick Salzano's girlfriend at the time;

    b.  $22,500 in total payments to Mobile Application Development LLC, a company with ties to Nick Salzano, for purported "Investment Property Marketing/SEO FEE"; and

    c.  $17,025 in total payments to Rey Grabato for "2 Hanover-Staging" – presumably furniture staging costs at one of the Debtor properties.

    **Ex. R**, Advertising Transfers.

95.    On May 29, 2020, Salzano emailed Gutierrez and D'Urso to explain how NRIA distinguished advertising related to investor recruitment.

> Regarding whether any advertising should be a current expense let me clarify. **All advertising selling residential units for occupancy will be ignored and not included in the amortization of investor advertising**. We are able to clearly and easily distinct these two types of advertising by their mediums. The mediums I listed: Bloomberg, Sirius, Renascent, Effective Media, I Heart, KCBS – are those we use exclusively for investor recruiting / finding the right investor. They are financial business – talk media only…**Residential for sale of property for occupancy type of advertising only occurs on Zillow, Google, multiple listing service and other direct to general population type digital platforms including Instagram**…Again we will only pull out and amortize the investor direct recruiting media expenses (emphasis added).

> **Ex. P**, 2020.05.29 – Capitalizing Costs (emphasis added).

96.    Contrary to Salzano's explanation of mediums used for advertising related to the recruitment of investors, the 2019 transaction detail for account number 65115-0 included several entries related to digital media platforms including but not limited to:

    a.    $257,225 in total payments related to Facebook advertisements.

    b.    $78,145 in total payments related to Twitter online advertisements.

    c.    $42,350 in total payments related to advertisements through Google.

    **Ex. S**, Advertising Transfers by Medium.

97.    Salzano also requested that Defendants provide "Accounting entries for the above 10-year amortization on the above amount of money to this account." **Ex. Q**, 2020.06.06 – Investor Advertising. Gutierrez responded with the journal entries needed to capitalize the advertising expenses. *Id.* In recording these journal entries and applying a straight-line amortization for a period of 10 years, NRIA was able to expense only ***$1.1 million of the $10.7 million*** in 2019

advertising expenses.[5] This shifted over $9 million in expenses to future years that allowed the fraud to avoid showing a steep, current year loss in their 2019 financial statements.

98.    ███████████████████████████████████████

███████████████████████████████ **Ex. P**, 2020.05.29 Capitalizing Costs.

Using Gutierrez's own standard, Defendants' procedures were deficient in reviewing the accounting practice proposed by the Insiders and the related advertising amounts and amortization period. For example, Defendants accepted Salzano's push to extend the amortization period from 5 years to 7 years to 10 years. Each additional year that was added to the amortization period led to an increase in the 2019 profits recognized.

99.    ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████ **Ex. O**, GAAP Reporting Issues Replies. ██████████

████████

████████████████████████████████████████████████████████████

*Id.* (emphasis added).

100.    ██████████████████████████████████████

███████████████████████████████████████████

███████████████ *Id.* ██████████████████████████

███████████████████████████████ *Id.*

---

[5] Approximately $13 million in deferred assets was reported on NRIA LLC and Subsidiaries December 31, 2019 consolidated financial statements. The balance is comprised of approximately $9.6 million in advertising, promotional, & public relations expenses and approximately $3.4 million in marketing fees / project management expenses which includes the commissions paid to salespersons.

101. ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████.

102. ██████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████ **Ex. K**, 2020.11.11 –

Con. Report Email.



*Id.* (emphasis added).

103.    On March 22, 2021, D'Urso confirmed that advertising and marketing costs were

amortized in the 2019 consolidated financial statements. **Ex. T**, 2021.03.22 – Advertising

Expenses. No departure from GAAP was disclosed in the statements, and the only mention of the

capitalized advertising expenses was in a brief footnote stating, "[d]eferred assets consist of

capitalized direct – response advertising costs in accordance with Accounting Standards

Codification Topic 340, Capitalized Advertising Costs. It is the opinion of Management that such

costs were necessary to obtain and fulfill contracts and have a period and extent of expected future benefits of 10 years. Amortization of such costs will begin in 2020." **Ex. L**, 2019 Con. Fin. Statements. No mention of this non-GAAP accounting method was included in or changed Defendants' review report.

**Defendants Failed to Advise NRIA That Investments Must Be Recorded At Fair Value**

104.   In all financial statements in which Van Duyne was engaged to perform accounting services, NRIA entities improperly recorded investments at cost rather than at fair value as required under ASC 946 – Financial Services – Investment Companies.

105.   As a result, "Inventory of land and buildings", the largest line item on NRIA's balance sheet and assets of the company, was stated at cost rather than at fair value per year-end valuations and appraisals. The stated asset amount of "Inventory of land and buildings" on NRIA's balance sheet was $248,211,452 in 2018; $370,005,218 in 2019; and $411,916,826 in June 2020.

106.   This failure to identify this incorrect accounting treatment shows that Defendants failed to obtain and exercise an understanding of the real estate investment industry that NRIA operated within. Under AICPA accounting guidance for financial statement reviews, "[t]he accountant should possess or obtain an understanding of the industry in which the entity operates, including the accounting principles and practices generally used in the industry, sufficient to enable the accountant to review financial statements that are appropriate for an entity operating in that industry." (AR-C Sect. 90, Para .21).

**Defendants' Failure to Identify U.S. Construction as a Related Party**

107.   Despite numerous direct communications with Dustin Salzano and knowledge that USC maintained the books and records of many Debtor entities, Defendants repeatedly failed to identify USC as a related party.

36

108.    Under AICPA accounting guidance for financial statement reviews, the accountant has a duty to inquire and be alert for potential related parties and make sure these relationships are properly disclosed in the financial statements and related notes. Even if management has not previously disclosed the existence of related party relationships, the accountant should remain alert for these types of relationships – something Defendants failed to do.

    a.  "The accountant should inquire of members of management who have responsibility for financial and accounting matters concerning the financial statements, and others within the entity, as appropriate, about… the identification of related parties and related party transactions, including the purpose of those transactions…effects or possible implications for the entity of transactions or relationships with related parties." (AR-C Section 90, Para. .29).

    b.  "During the review, the accountant should remain alert for arrangements or information that may indicate the existence of related party relationships or transactions that management has not previously identified or disclosed to the accountant." (AR-C Section 90, Para. .32).

109.    Defendants knew that USC had access to and maintained Debtors' accounting books and records.



**Ex. I**, 2019.05.02 – Open Items.

110.    Defendants knew that Dustin Salzano prepared certain Debtor entity financial statements. For example, on May 8, 2020, Gutierrez emailed Nick Salzano referencing an income statement for 2031 Lombard, an NRIA entity, that was prepared by Dustin Salzano. **Ex. U**, 2020.05.08 - Lombard.

111.



**Ex. V**, Email to Dustin (emphasis added).

112.    Defendants were included on several email communications with Dustin Salzano and the Insiders. Defendants knew or should have known about the familial relationship between Nick and Dustin Salzano and the close relationship between the two purportedly independent entities of NRIA and USC.

113.    USC was also one of the largest recipients of NRIA and investor funds. From 2016 to 2022, NRIA transferred more than $148 million to USC. Many of these funds were transferred

between the two entities under purported verbal, undocumented loan. Both Dustin Salzano and USC financially benefited from these transfers and their close relationship with the Insiders.

114.    Despite having significant information suggesting there was a related party relationship between NRIA and USC, Defendants failed to identify this relationship and ensure it was properly disclosed in NRIA's financial statements.[6]

### Van Duyne Fails to Address Altered Bank Statements

115.    The Liquidation Trustee is aware of Insiders altering bank statements for at least two Debtor entities: NRIA Brooklyn II LLC and NRIA 423 Third Manager LLC.

116.    The December 2017 bank statement for NRIA Brooklyn II LLC was altered to show a $1,000,000 deposit described as a "Loan from Sapphire Property Ven" on December 29, 2017. **Ex. W**, Brooklyn II Altered Statement; **Ex. X**, Brooklyn II Compilation Workpapers. The bank statement produced by the financial institution which held this Debtor account for the same period does not include a $1 million deposit. **Ex. Y** Brooklyn II TD Produced Statement.

117.    Similarly, the December 2017 bank statement for NRIA 423 Third Manager LLC was altered to show a $1,000,000 deposit also described as a "Loan from Sapphire Property Ven" on December 29, 2017. **Ex. Z**, Third Manager Altered Statement. The bank statement produced by the financial institution which held this Debtor account for the same period does not include a $1 million deposit. **Ex. AA**, Third Manager TD Produced Statement. Again, Defendants did not request support from NRIA or the Insiders regarding the large, round dollar deposit at year end resulting in a $1 million inflation in the cash balance for this entity as well and never sought to confirm NRIA's deposit and banking activity by looking at the actual statements from the depositing bank.

---

[6] Premier, the property management company used by many Investors, was also co-owned by Dustin Salzano and should have been identified as a related party.

118.    Despite the large, rounded numbers in the exact same amount deposited *on the same day* and *from the same entity* in two different accounts, Defendants did not investigate the suspicious deposits. Under AICPA accounting guidance for financial statement reviews, the accountant should inquire with management about "[s]ignificant transactions occurring or recognized during the period, particularly those in the last several days of the reporting period." (AR-C Sect. 90, Para. .29-c.-iv).

119.    █████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████    **Ex. BB**, 2019.09.05 - Sapphire Investment.

120.    █████████████████████████████████████████████

██████████████████    *Id.* ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████    *Id.*

121.    █████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████    *Id.* Despite both Gutierrez and D'Urso being on the email and Gutierrez responding to thank Salzano, neither Van Duyne accountant questioned the $1,000,000 discrepancy in NRIA Brooklyn II's year-end cash balance between the unaltered bank statement and balance sheet included in the forwarded email. Neither Van Duyne

accountant questioned the absence of the $1,000,000 fictitious deposit transaction on the unaltered

bank statement, despite this transaction being the basis for their initial inquiry. *Id.*

### Defendants Knew the Financial Statements They Reviewed Were Relied Upon by Investors and Lenders

122.     Defendants were copied on emails to at least one potential investor regarding the

financial statements it reviewed. In August 2019, G.K.[7], a potential investor, signed a

confidentiality agreement to see the NRIA's financial documents. ███████████████

████████████████████████████████████████████████████

██████████████████████████ ████████████████████████

████████████████████████████████████████████████████

███████████████████████ **Ex. CC**, 2019.08.29 - Intro. G.K. subsequently invested

$740,000 in the Fund between the period of September 2019 to January 2021. Multiple instances

of NRIA providing prospective investors with their financial statements, prepared by Defendants,

were identified by Plaintiff.

123.     Similarly, Defendants knew lenders would review the financial statements

Defendants compiled. On July 1, 2020, Salzano requested that Defendants compile documents for

the Debtor entity Wright By the Sea 1901, LLC (also known as the Ocean Delray project), with

the subject line of the email stating in part: "Quarterly compilations will be needed CIM the

lender." **Ex. DD**, 2020.07.01 – CIM Compilations. Salzano noted that "[u]nfortunately cim [the

lender] is very strict with quarterly compilations." *Id.*

124.     ██████████████████████████████████████████████

████████████████████████████████████████████████████

---

[7] When referring to specific Investors, Plaintiff uses initials to maintain the Investor's privacy.

████████████████████████████████████ **Ex. EE**, 2020.10.26 - Financials to

CIM.

125.     Defendants were also consulted by the Insiders regarding the language and terms

of NRIA's PPMs that were distributed to Investors. For example, on January 15, 2021, Salzano

forwarded an email from the attorneys assisting NRIA in drafting PPMs to Gutierrez, D'Urso, and

another Van Duyne employee, Raymon Pinglora. **Ex. FF**, PPM Tax Rate Emails. In the email,

Salzano addressed Gutierrez, noting the information was "just a few updates for the call," and

detailed the structure of new private placement securities. *Id.* Gutierrez responded stating, "we will

need another half hour to study this for the call." *Id.*

126.     Similarly, on January 25, 2021, Salzano emailed the same Van Duyne

representatives regarding "a new private placement offering of installment note debt raised which

will ultimately be convertible into the partners portfolio fund 1." **Ex. GG**, PPM Equity Emails.

Specifically, Salzano was seeking tax advice "to avoid a negative booking to profits event." *Id.*

Gutierrez responded that his "initial opinion for GAAP is no" but that he would confirm. *Id.*

Salzano, John Collins of NRIA, and Gutierrez then scheduled a call to discuss this issue and a

separate audit issue. *Id.*

### The AUM Letter

127.     Defendants also provided an Assets Under Management ("AUM") letter for NRIA

to facilitate the Insiders' purchase of CMBSs and to enable NRIA to obtain further loans.

Defendants signed the AUM letter that estimated that NRIA's AUM totaled at $1.2 billion which

was not true. **Ex. HH**, 2020.11.13 AUM Letter.

128.     The AUM letter was derived from a draft letter that Salzano sent Defendants in

November 2020 for Defendants' review and signature. **Ex. II**, 2020.11.12 – AUM Email.

129.    Gutierrez responded by email to the draft AUM letter from Salzano noting that he

was still waiting to hear from Van Duyne's insurance carrier and explicitly acknowledging the

potential liability for Van Duyne associated with signing the letter by stating in part:

> Who drafted the sample letter as words like confirmation, certification, etc.
> [are] prohibited and as you mention there will be significant disclaimers. With
> this in mind, I am merely making a comment so it is known in advance because
> there is a high possibility that *a firm like Wipfli which has substantially higher
> malpractice insurance coverage may be able to provide this with a wording a
> little closer than what is in the draft letter*.

> *Id.* (emphasis added).

130.    In response, Salzano told Gutierrez "[p]lease feel free to increase your E & O

insurance because of us and make it up and all the additional fees for the work that we are requiring

you to do which is extensive as you know." *Id.*

131.    The Insiders needed an outside accounting firm to sign off on the AUM letter, and

Defendants once again obliged in exchange for additional fees – despite having a consciousness

of guilt evidenced by Gutierrez discussing Van Duyne's accounting malpractice policy. Salzano

also told Gutierrez that the bank has no definition of "assets under management" and so NRIA is

free to provide its own, which Salzano suggested should be a more liberal definition than the one

O'Brien previously provided. *Id.* According to Salzano, "assets under management" can include

all of the assets that NRIA manages for others in addition to its own, and Salzano proceeded to

provide his list of NRIA's assets, including an arbitrary 35% markup on NRIA's properties that

were still being built to account for the higher value of the new construction that would be added,

which significantly increased the total AUM amount. *Id.*

132.    The Insiders subsequently sent the AUM letter, signed by Van Duyne, to Morgan

Stanley on November 16, 2020, and CitiBank on February 11, 2021. **Ex. JJ**, 2020.11.16 - Client

Questionnaire; **Ex. KK**, 2021.02.11 Structured Credit Strategies. The Insiders sent the AUM letter,

prepared and executed by Defendants, to these financial institutions in an effort to obtain credit and engage in CMBS transactions.

133.    Defendants were aware that the AUM letter was prepared to be provided to Investors and lenders. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████ **Ex. LL**, Emails re AUM.

134.    ████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████ *Id.* █████████████████████

████████████



*Id.* As evidenced by this email chain, Defendants were taking instruction from Dustin Salzano, an undisclosed related party not employed by NRIA, related to NRIA's accounting; Defendants knew the Insiders were causing NRIA to pay USC out of Debtors' Investors' deposits and down payments; and Defendants agreed to combine the escrow draw funding line item into a miscellaneous payable which would obfuscate the Insiders' fraudulent practices.

135.    In addition to the AUM letter being provided by the Insiders to multiple financial institutions in an attempt to obtain credit and engage in CMBS transactions, the Liquidation

Trustee is aware of at least one instance where the signed AUM letter was provided to a potential investor in December 2020. **Ex. MM**, 2020.12.12 - Latest Financials.

### Defendants' Independence Issues

136.    When performing a review of financial statements, accountants must be independent. AR-C Section 90 – Review of Financial Statements at para .10. Accountants must also plan and perform the review with professional skepticism, recognizing that circumstances may exist that cause the financial statements to be materially misstated. (AR-C Sect. 90, Para .11).

137.    The AICPA Code of Professional Conduct ("AICPA Code") provides the following guidance regarding accountant independence that applied to Defendants' services performed for the Debtors:

  a.    "Accountants should maintain objectivity and be free of conflicts of interest in discharging professional responsibilities. A member in public practice should be independent in fact and appearance when providing auditing and other attestation services. The principle of objectivity imposes the obligation to be impartial, intellectually honest, and free of conflicts of interests. Regardless of service or capacity, members should protect the integrity of their work, maintain objectivity, and avoid any subordination of their judgment. The maintenance of objectivity and independence requires a continuing assessment of client relationships and public responsibility." AICPA Code at 0.300.050.01-.04.

  b.    "Independence is a state of mind that permits a member to perform an attest service without being affected by influences that compromise professional judgment. **A member should determine whether such influences, if present, create a threat that is not at an acceptable level that a member would not act with integrity**

and exercise objectivity and professional skepticism in the conduct of a particular engagement.** *Id.* at 0.400.23 (emphasis added).

c. **"Threats are relationships or circumstances that could impair independence."** *Id.* at 0.400.51 (emphasis added).

d. "Many threats fall into one or more of the following seven broad categories: adverse interest, advocacy, familiarity, management participation, self-interest, self-review, and undue influence." *Id.* at 1.000.010.08.

e. **"Undue influence threat is the threat that a member will subordinate his or her judgment to that of an individual associated with an attest client or any relevant third party due to that individual's reputation or expertise, aggressive or dominant personality, or attempts to coerce or exercise influence over the member."** *Id.* at 1.210.010.06-.18. (emphasis added).

138.    Salzano's influence over Gutierrez and Van Duyne compromised their independence and ability to objectively serve the Debtors as a client. Gutierrez's continued willingness to accept Salzano's flawed explanations of NRIA's accounting practices and business model rather than perform the engagement with due care and professional skepticism rendered NRIA's financial statements and Van Duyne's reports worthless and aided the Insiders in furthering the massive Ponzi scheme.

**Defendants Ignored Numerous Red Flags of a Ponzi Scheme**

139.    Defendants had unfettered access to NRIA's financial records through their role as NRIA's external financial professionals and yet ignored the following numerous red flags described throughout this complaint that the Insiders were operating as a massive Ponzi scheme:

a. The Insiders caused NRIA to offer high, guaranteed returns to Investors with little
to no risk. Despite these high, guaranteed returns, Defendants knew that NRIA was
making little to no actual profits and Investors could not be paid with proceeds from
NRIA's real estate operations. ███████████████████████████████████████
███████████████████████████████████ **Ex. N**, GAAP Reporting Issues
(emphasis added). The only possible business model consistent with Insiders'
operation of NRIA was the operation of a Ponzi scheme that required new investors
to repay older investors.

b. Unusual and inappropriate accounting practices were used by the Insiders with the
assistance of Defendants used to create the appearance that NRIA was in a stronger
financial position than NRIA actually was. These practices include the recognition
of upfront development fees and the capitalizing of advertising expenses to reduce
current year expenses and boost profits. Without these unusual, non-GAAP
accounting methods, NRIA's financial statements and reports would have shown
steep year-over-year losses. *See* chart below for a graphic representation of this
point.

**NRIA LLC and Subsidiaries Consolidated Illustrative Income Statements**
*For Years in which Van Duyne Performed Review Services*

| | 2018 | | | 2019 | | |
|---|---|---|---|---|---|---|
| | Non-GAAP FS Reviewed By Van Duyne | GAAP Adjustment | GAAP FS | Non-GAAP FS Reviewed By Van Duyne | GAAP Adjustment | GAAP FS |
| Revenue[1] | $14,913,243 | ($11,130,000) | $3,783,243 | $24,807,986 | ($19,000,000) | $5,807,986 |
| Cost of Sales[2] | 3,913,185 | | 3,913,185 | 2,381,313 | (377,174) | 2,004,139 |
| Gross Profit | 11,000,058 | | (129,942) | 22,426,673 | | 3,803,847 |
| Selling, general, and administrative expenses[2] | 8,562,982 | | 8,562,982 | 17,752,338 | 13,426,983 | 31,179,321 |
| **Income from Operations** | 2,437,076 | | (8,692,924) | 4,674,335 | | (27,375,474) |
| Other income (expense) | | | | | | |
| Rental income | 48,133 | | 48,133 | - | | - |
| Interest income | (7,936) | | (7,936) | - | | - |
| Interest expense | (562,611) | | (562,611) | 3,037,621 | | 3,037,621 |
| Total Other Expense | (522,414) | | (522,414) | 3,037,621 | | 3,037,621 |
| Income before provision for income taxes | 1,914,662 | | (9,215,338) | 1,636,714 | | (30,413,095) |
| Provision for income taxes[3] | (2,250) | | (2,250) | (87,952) | | (87,952) |
| **Net Income** | $1,912,412 | | (9,217,588) | $1,548,762 | | ($30,501,047) |

**Notes**
[1]  In its 2019 financial statements, NRIA named this line item "Revenue, Asset Management, Development and Project Management fees"
[2]  The current year amortization expense of $377,174 for marketing fees was included in "Cost of Sales" in the 2019 NRIA financial statements. For the purposes of this illustrative calculation, this amount was deducted from "Cost of Sales" and applied to "Selling, general, and administrative expenses" where the capitalized advertising expenses are recorded.
[3]  The provision for income taxes amounts was not updated for the purposes of the illustrative calculation.

c.  The Insiders caused NRIA to engage in a massive, expensive advertising and marketing initiative with the goal of recruiting new investors to keep the fraud scheme afloat. In 2019, NRIA spent over $13 million on advertising and marketing that was funded by existing investor money. ████████████████████ ██████████████████ **Ex. P**, 2020.05.29 – Capitalizing Costs. Notably, NRIA in total spent more than $80 million in advertising and promotional costs, which amounts to approximately 14% of the funds received from Investors.

d.  The Insiders provided large bonuses and phantom profits to entice Investors "roll up" their investments into the Fund and reduce redemption payments. These bonuses that increased the amounts owed to the rolled up Investors also diluted the interests of other Investors and were aimed at avoiding payouts to LLC Investors, thereby keeping investor funds within NRIA to help further the Ponzi scheme.

    e.   Despite the Insiders promising Investors that each LLC would use its own money to pay for its expenses and would not be commingled with other companies or projects, funds were routinely commingled among other LLCs and NRIA itself without the Investors' knowledge.

    f.   Nick Salzano's title was "Senior Independent Executive Advisor & Portfolio Construction Manager", and he was not in any of NRIA's marketing materials, but Defendants knew that Salzano was one of the ultimate decision-makers at NRIA.

140.   Defendants' intentional failure to address the numerous signs of NRIA's operation as a Ponzi scheme illustrates Defendants failure to perform their accounting and financial reporting duties as established under AICPA guidelines; failure to exercise professional skepticism; failure to consider the sufficiency and appropriateness of review evidence obtained in light of management's inaccurate and unreliable responses; and failure to exercise independence. As Defendants were aware, Defendants' misconduct led to, among other things, misleading financial statements inflating the profitability of NRIA and defrauding numerous Investors and lenders.

**Van Duyne's and Gutierrez's History of Failing to Protect Investors and PCAOB Disciplinary Action**

141.   Defendants have a history of failing to adequately protect investors. On November 28, 2017, shortly before Van Duyne began working with Debtors, the Public Company Accounting Oversight Board ("PCAOB") issued an order sanctioning Van Duyne and Gutierrez for actions taken during an audit of a broker-dealer's financial statements. **Ex. NN**, PCAOB Order. **Exhibit NN** is a true and accurate copy of the November 28, 2017, Order issued by the PCAOB. The PCAOB "regulates the audits of public companies and SEC-registered brokers and dealers in order

to protect investors". [8] The PCAOB deemed it "necessary and appropriate, for the protection of investors and to further the public interest in the preparation of informative, accurate, and independent audit reports, that disciplinary proceedings be, and hereby, are instituted" against Van Duyne and Gutierrez. *Id.*

142.    The PCAOB order specifically found that Van Duyne failed to comply with auditor independence requirements, failed to exercise due professional care and skepticism, failed to obtain sufficient appropriate audit evidence, and failed to perform adequate procedures on supplemental information. *Id.* In addition, the PCAOB found that Van Duyne "failed to presume there is a fraud risk involving improper revenue recognition" and "also failed to evaluate whether information produced by management was sufficient and appropriate as audit evidence." *Id.* at ¶¶ 23, 25. The audit at issue had been reviewed and approved by Gutierrez in his role as engagement quality reviewer. *Id.*

143.    As a result of the November 28, 2017, PCAOB order, Van Duyne's public accounting firm registration was revoked for at least two years and Gutierrez was barred from being an associate person of a registered public accounting firm[9] for at least one year. *Id.*

---

[8] *Mission, Vision, and Values*, PCAOB (last accessed Sept. 11, 2024), https://pcaobus.org/about/mission-vision-values.
[9] An "associated person" is "any individual proprietor, partner, shareholder, principal, accountant, or professional employee of a public accounting firm, or any independent contractor or entity that, in connection with the preparation or issuance of any audit report" receives compensation from the firm or participates on behalf of the firm in any activity of the firm. *See Rules of the Board – Section 1: General Provisions*, PCAOB, (last accessed Aug. 21, 2024), available at https://pcaobus.org/about/rules-rulemaking/rules/section_1.

## COUNT I AGAINST VAN DUYNE AND GUTIERREZ – AIDING AND ABETTING FRAUD

144.    The Liquidation Trustee repeats and realleges all prior applicable allegations as if fully set forth herein.

145.    As established herein, the Insiders fraudulently operated NRIA as a Ponzi scheme which caused millions of dollars of damages to approximately 2,000 individual Investors – many of whom were elderly, and in some instances, invested their life savings with the Debtor entities including the Fund. Salzano pleaded guilty to fraudulently operating NRIA and his allocution included the elements of a Ponzi scheme, *see* Plea Agreement filed in *United States of America v. Salzano and Grabato* (D.N.J. Case No. 22-00690, Docket No. 86), and this Court has applied the Ponzi Scheme presumption to NRIA's operations, *see AIRN Liquidation Trust Co., LLC, v. Media Effective LLC et al.*, Adv. Pro. No. 23-01335, Docket No. 19, at *7 (October 11, 2024).

146.    By virtue of the acts and omissions described herein, the Insiders demonstrably committed a fraud and were engaged in perpetuating a Ponzi scheme by, among other things, knowingly manipulating and often falsifying NRIA's financial statements, bank statements, and financial information and actively misrepresenting true profitability by concealing the fact that NRIA had little to no revenue to pay Investors the alleged guaranteed 12% or more returns except from other defrauded Investor's money.

147.    But the Insiders did not commit their fraud alone. The Insiders' fraud was aided and abetted by others, including Defendants. But for Defendants' conduct, particularly as it relates to Defendants' accounting activities and beyond, the Ponzi scheme would not have been as expansive and destructive to thousands of Investors and the Debtors themselves.

148.    Defendants knew that the Insiders were operating a massive fraud. Defendants knew that the Insiders had no intention of keeping the promises that the Insiders caused NRIA to

make to Investors and lenders. Defendants assisted Insiders in hiding these misrepresentations through accounting practices because Defendants knew the representations were important to Investors and lenders, and that Investors and lenders would rely on them when making investments.

149.    The Investors were reasonable in relying upon representations made to them in connection with their investments.

150.    In relying on these material misrepresentations from the Insiders, which were supported and perpetrated by Defendants, Investors chose to entrust substantial investment monies to NRIA which were systematically diverted for the benefit of the Insiders without the Investors' knowledge.

151.    Defendants benefited from their participation in the Insiders' Ponzi scheme through payments from NRIA.

152.    Defendants were aware of the role they played in the illegal scheme at the time they assisted the Insiders. Defendants had access and exposure to NRIA's financial records, such that anyone with their same experience would have understood that the Insiders were operating a fraud on the Investors and lenders.

153.    Defendants knowingly and substantially assisted the Insiders in their fraud.

154.    Defendants' actions enabled the Insiders to extend the longevity of their fraudulent scheme, to sell millions in additional unregistered, illicit securities, and further damage Investors and the Debtors themselves.

155.    As a result of Defendants' misconduct, the Investors, and therefore the Debtors, suffered an injury through funds lost to the Ponzi scheme engaged in by the Insiders and aided and abetted by Defendants.

156.    As a direct and proximate result of Defendants' aiding and abetting of fraud, Plaintiff, the Debtors and Investors, has been damaged in an amount to be determined at trial.

157.    Based upon the foregoing, the Liquidation Trustee is entitled to a judgment against Defendants finding that they aided and abetted the Insiders' fraudulent Ponzi scheme and awarding damages in an amount to be determined at trial, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## COUNT II AGAINST VAN DUYNE AND GUTIERREZ – AIDING AND ABETTING SECURITIES FRAUD PURSUANT TO THE NEW JERSEY UNIFORM SECURITIES ACT (N.J.S.A. § 49:3-71)

158.    The Liquidation Trustee repeats and realleges all prior applicable allegations as if fully set forth herein.

159.    Under New Jersey law, an individual violates the New Jersey Uniform Securities Act ("NJUSA") if they, among other things:

(a) Offer, sell, or purchase a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;

(b) Offer, sell, or purchase a security by employing any device, scheme, or artifice to defraud;

(c) Offer, sell, or purchase a security by engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, or

(d) Engage in the business of advising others, for compensation, either directly or through publications or writings, as to the value of securities, or as to the advisability of investing in, purchasing or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities (i) in willful violation of this act or of any rule or order promulgated pursuant to this act, or (ii) employs any device, scheme or artifice to defraud the other person or engages in any act, practice or course of business or conduct which operates or would operate as a fraud or deceit on the other person, is liable as set forth in subsection (c) of this section.

N.J.S.A. § 49:3-71(a).

160.    Furthermore, the NJUSA establishes a broad scope of parties that may be liable for violations of the act:

Every person who directly or indirectly controls a seller liable under subsection (a) of this section, every partner, officer, or director of such a seller, or investment adviser, every person occupying a similar status or performing similar functions, every employee of such a seller or investment adviser who materially aids in the sale or in the conduct giving rise to the liability, and every broker-dealer, investment adviser, investment adviser representative **or agent who materially aids in the sale or conduct are also liable jointly and severally with and to the same extent as the seller or investment adviser**, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts under paragraphs (1) through (5) of subsection (a) of this section which give rise to liability. There is contribution as in cases of contract among the several persons so liable.

N.J.S.A. § 49:3-71(a) (emphasis added).

161. Defendants, as accountants, served as an agent of NRIA, and in that capacity, provided an assortment of accounting services to the Debtors that materially aided the Insiders in their fraud.

162. Defendants knew that the Insiders used NRIA to perpetrate a Ponzi scheme and that the scheme was continuing.

163. Defendants obtained the Debtors' and Investors' reliance on them for accounting services, and the Debtors and Investors reasonably relied on Defendants to ensure that financial statements, K-1s, and other financial documents were not misleading.

164. Defendants were consulted by the Insiders regarding the language and terms of NRIA's PPMs that were distributed to Investors.

165. Through the services provided to NRIA, Defendants materially participated in and helped effectuate the Insiders' sale of securities, as well as other related conduct, for their own personal gain–aiding and abetting not only in the defrauding of Investors but also in violation of the NJUSA to the detriment of the Investors.

166.     Defendants knew that NRIA's financial documents relied upon by Investors and lenders contained misstatements, misleading information, and omissions but did nothing to stop the documents' dissemination and continued to provide the Insiders with accounting services.

167.     Defendants possessed the necessary expertise to identify the Ponzi scheme and to understand that Defendants' continued participation facilitated the Ponzi scheme.

168.     As a result of Defendants' aiding and abetting the Insiders in selling securities in violation of the NJUSA, the Debtors and Investors were injured and lost millions of dollars to the Ponzi scheme.

169.     Based upon the foregoing, the Liquidation Trustee is entitled to a judgment finding that Defendants aided and abetted securities fraud in violation of the NJUSA and is entitled to damages pursuant to N.J.S.A. § 49:3-71 in an amount to be determined at trial, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## COUNT III AGAINST VAN DUYNE AND GUTIERREZ – ACCOUNTING MALPRACTICE

170.     The Liquidation Trustee repeats and realleges all prior applicable allegations as if fully set forth herein.

171.     Defendants were engaged to provide services to NRIA, including the review and compilation of financial statements and preparation of tax returns and Investor K-1s, among other *ad hoc* accounting and financial reporting requests. As such, Defendants had a duty to NRIA to perform these services with reasonable care.

172.     Defendants breached their duties to NRIA by advising NRIA contrary to GAAP accounting standards for Defendants' personal benefit and failing to follow various accounting guidelines by, among other things:

a. Accepting unusual transactions and accounting practices and significant transactions in the last days of a reporting period;

b. Failing to perform reviews that met the standards established under AICPA guidance;

c. Allowing more than $40 million in upfront development, asset management, and project management fees to be recognized by on NRIA financial statements which concealed steep year-over-year losses;

d. Capitalizing more than $13 million in advertising and marketing expenses which concealed significant losses in NRIA's financial statements and failing to disclose the same;

e. Misrepresenting NRIA's assets under management in the AUM letter which Defendants knew would be relied about by, at the very least, multiple lenders;

f. Reporting false and misleading financial reports of NRIA to Investors and lenders;

g. Failing to exercise professional skepticism;

h. Failing to consider the sufficiency and appropriateness of review evidence obtained in light of management's inaccurate and unreliable responses;

i. Failing to advise NRIA that investments must be recorded at fair value;

j. Failing to identify USC as a related party;

k. Failing to address altered bank statements inflating the profitability of NRIA;

l. Failing to exercise independence; and

m. Ignoring red flags of a Ponzi scheme.

173. Defendants knew that the NRIA would rely on Defendants' accounting services to make significant financial decisions.

174.    Defendants' breach of accepted accounting principles caused NRIA to suffer significant damages.

175.    Based on the foregoing, the Liquidation Trustee is entitled to a judgment against Defendants for the damages caused by the Defendants' malpractice, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## COUNT IV AGAINST VAN DUYNE AND GUTIERREZ: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

133.    The Liquidation Trustee repeats and realleges all prior applicable allegations as if fully set forth herein.

134.    The Insiders owed fiduciary duties to NRIA and NRIA's Investors, including but not limited to the duties to act in good faith and to conduct themselves in a manner that was in the best interest of both NRIA and its Investors. As part of their fiduciary duties, they were also required to be honest and candid and to make complete and accurate disclosures in their dealings with the Investors in all material respects.

135.    The Insiders actively misrepresented information to Investors and failed to disclose their conflicts of interest and misuse of Investor funds, to the personal benefit of the Insiders and their families and friends.

136.    Defendants played an active and informed role in these breaches, and in fact, knew of these misrepresentations and conflicts of interest, among others, and took no meaningful steps to try and address them.

137.    After learning of the fraud, Defendants did not sound the alarm.

138.    Through their acts and omissions, the Insiders repeatedly violated their fiduciary duties to Investors, and Defendants knowingly gave substantial assistance to the Insiders in breaching these fiduciary duties.

139.    As a result of Defendants' aiding and abetting the Insiders' breaches of fiduciary duties, Debtors and Investors were injured and lost millions to the Ponzi Scheme.

140.    Based upon the foregoing, the Liquidation Trustee is entitled to a judgment finding that Defendants aided and abetted the Insiders' breaches of their fiduciary duties and awarding damages in an amount to be determined at trial, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## COUNT V AGAINST VAN DUYNE: UNJUST ENRICHMENT

176.    The Liquidation Trustee repeats and realleges all prior applicable allegations as if fully set forth herein.

177.    Van Duyne was enriched and received economic benefits without justification as a result of its conduct, including but not limited to its receipt of approximately $700,000 from NRIA.

178.    Van Duyne's retention of the payments is unjust, and it would be inequitable for Van Duyne to retain the benefit conferred on it by NRIA and for those assets to remain out of reach of the Debtors' creditors and Investors.

179.    Further, by receiving payment for services that aided and abetted Insiders' fraud, Van Duyne has been unjustly enriched at the expense of the Debtors, the Debtors' creditors, and the Investors.

180.    Based upon the foregoing, the Liquidation Trustee is entitled to judgment against Van Duyne in the amount it was unjustly enriched, including but not limited to approximately

$700,000, together with an award for pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Liquidation Trustee respectfully requests entry of a final judgment in favor of the Liquidation Trustee and against Defendants as follows:

(a) On Count I, a judgment against Defendants finding they aided and abetted fraud and for money damages in an amount to be determined at trial;

(b) On Count II, a judgment against Defendants finding that they aided and abetted securities fraud and for money damages in an amount to be determined at trial;

(c) On Count III, a judgment against Defendants finding Defendants committed accounting malpractice and for money damages in an amount to be determined at trial;

(d) On Count IV, a judgment against Defendants finding Defendants aided and abetted breaches of fiduciary duties and for money damages in an amount to be determined at trial;

(e) On Count V, a judgment against Van Duyne in the amount it was unjustly enriched, including but not limited to $700,000;

(f) Awarding the Liquidation Trustee compensatory damages;

(g) Awarding the Liquidation Trustee attorney's fees and costs to the extent permitted by law;

(h) Awarding the Liquidation Trustee punitive damages to the extent permitted by law;

(i) Awarding the Liquidation Trustee pre- and post-judgment interest as may be permitted by law on all amounts awarded hereunder at the maximum applicable judgment rate plus costs of the suit; and

(j) Awarding the Liquidation Trustee such further relief as the Court deems just and proper.

Dated: March 14, 2025

     */s/ Jessa DeGroote*
     Louis T. DeLucia, Esq.
     Alyson M. Fiedler, Esq.
     Jessa DeGroote, Esq.
     George A. Gasper, Esq. (admitted *pro hac vice*)
     **ICE MILLER LLP**
     1500 Broadway, Suite 2900
     New York, NY 10036
     Phone: (212) 835-6312
     louis.delucia@icemiller.com

alyson.fiedler@icemiller.com
jessa.degroote@icemiller.com
george.gasper@icemiller.com

*Counsel to the Liquidation Trustee*